J-A01006-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.H.-C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: K.H.-C., A MINOR | : | |
| | : | |
| | : | No. 3169 EDA 2022 |

Appeal from the Dispositional Order Entered November 15, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-JV-0001242-2022

BEFORE:   LAZARUS, P.J., PANELLA, P.J.E., and COLINS, J.[*]

MEMORANDUM BY LAZARUS, P.J.:                    **FILED FEBRUARY 12, 2024**

K.H.-C. appeals from the trial court's dispositional order following his adjudication of delinquency for one count each of firearms not to be carried without a license[1] and possession of a firearm by a minor.[2]  K.H.-C. contends that the police unlawfully seized and searched him without reasonable suspicion, probable cause, or any exigency and, thus, any evidence uncovered from the search should have been suppressed.  After careful review, we affirm.

Officer Mark Anthony of the Philadelphia Narcotics Strike Force testified that on October 6, 2022, he was on duty as a backup police officer to two plain clothes narcotics officers who were surveilling the 900 block of North

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. § 6106(a)(1).

[2] *Id.* at § 6110(a).

Carlisle Street in Philadelphia. *See* N.T. Suppression Hearing, 10/28/22, at 9. The officers were surveilling that block "due to multiple complaints of narcotics activity in the area, as well as increased violence in the area." *Id.* at 17; *see also* PARS[3] Report, 10/7/22, at 2 (surveillance officers set up "narcotics surveillance in the area of 900 N[.] Carlisle St. due to multiple complaints of narcotic activity and increased violence in the area"). That day, at approximately 3:20 P.M. and 3:45 P.M., the surveillance officers observed two black males conducting what they believed to be hand-to-hand transactions to several buyers. *See* PARS Report, 10/7/22, at 2. The surveillance officers' PARS report stated that the suspected sellers were wearing "black face mask[s], black hoodie[s] with a white North Face logo[,] and black track pants." PARS Report (Exhibit C-1), 10/7/22, at 2. At approximately 3:50 P.M., the surveillance officers observed two other unknown individuals approach the two sellers on Carlisle Street. *Id.*

At 3:57 P.M., the surveillance officers sent a flash report that "gave the description of both [suspects] and their exact location to the backup officers, [which included Officer Anthony,] in the area." *Id.* Officer Anthony testified that the flash report described the suspects as "a black male . . . [t]hree

---

[3] Philadelphia's Preliminary Arraignment Reporting System (PARS) is a records database that serves as the police arrest reporting function for the District Attorney's Charging Unit. *See* https://www.phillypolice.com/assets/directives/D5.14-InvestigationAndChargingProcedure.pdf (last visited 1/17/24).

males, all fitting the same description[,] black jacket and black pants. All on the 900 block of North Carlisle Street." N.T Suppression Hearing, 10/28/22, at 9. *See* PARS Report, 10/7/22, at 2 ("At approximately 3:57 P[.]M[., Officer] Holden gave the description of both [suspects] and their exact location to the back[]up officers in the area. They were standing in a group with several males.").

Less than one minute after receiving the report, Officer Anthony saw three black males, all fitting the flash description,[4] huddled together on the 900 block of North Carlisle Street. *See* N.T. Suppression Hearing, 10/28/22, at 10; *id.* at 15 (Officer Anthony testifying flash radio communications from fellow officers are "constant [in that the relaying officers are] seeing it [as they] are relaying it to you[.]"). Officer Anthony stopped the three males, one of whom was K.H.-C., and told them that they were not free to leave until they were identified. *Id.* at 10, 15, 17. *See id.* at 18, 20 (stipulating K.H.-C. "in immediate vicinity standing . . . together in group [with two alleged drug dealers], huddled, speaking with each other").

When Officer Anthony stopped K.H.-C., he "grabbed him around his arms[,] went up against the car with him[, a]nd heard a metal sound hit against the car." *Id.* at 10. After hearing the sound, Officer Anthony asked K.H.-C., "Oh. What's that?" *Id.* K.H.-C. replied that he had a Glock 9 mm 40 caliber gun with an extended clip in his waistband, but that it was "turned

---

[4] There was also a fourth black male stopped who was wearing a yellow jacket. *Id.* at 10.

upside down." *Id.* Officer Anthony seized the gun from "inside the little bottom of [K.H.-C.'s] pants[;]" the gun, which had an extended clip on it, was loaded with 23 rounds in the magazine and one round in the chamber. *Id.* at 10-12. When the surveillance officers arrived on the scene to identify the suspected drug dealers, they noted that K.H.-C. was not one of the males they had observed conducting the earlier hand-to-hand transactions. *Id.* at 10.

Prior to trial, K.H.-C. filed a motion to suppress the gun uncovered during the stop, alleging that the officers lacked either reasonable suspicion or probable cause to stop him. Specifically, defense counsel argued that the surveillance officer's flash report did not consist of any specific, individualized information and the officers did not observe K.H.-C., himself, participate in any illicit activity before he was seized and searched. On October 28, 2022, the court held a suppression hearing at which the Commonwealth presented Officer Anthony as a witness; the parties also stipulated to and entered, as an exhibit, the Philadelphia Police Department Arrest Record[, page 2 of the PARS report,] to represent "what the eyes [i.e., the surveillance officers] in this case would have said if they testified." *Id.* at 16. Following the hearing, the court denied the motion.

The evidence from the suppression hearing was incorporated into the record and, on November 14, 2022, following an adjudicatory hearing, K.H.-C. was adjudicated delinquent by the Honorable Jonathan Q. Irvine of the above-cited offenses. The following day, the court entered a dispositional

order committing K.H.-C. to a state-run residential facility.[5]  K.H.-C. filed a timely notice of appeal and court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal.  On appeal, K.H.-C. raises the following issues for our review:

> (1)  Did the police unlawfully seize [K.H.-C.] at the time he was physically restrained by conducting a custodial arrest without probable cause, or an investigative detention without reasonable suspicion, where the officer acted in reliance on an overly-broad[,] non-individualized description of possible suspect, and [,] therefore[,] the physical evidence recovered from [K.H.-C.] was [the] fruit of an unlawful seizure in violation of [K.H.-C.'s] rights under the Fourth and Fourteenth Amendments to the U.S. Constitution, and under the broader protections of Article I, Section 8[,] of the Pennsylvania Constitution?
>
> (2)  Because police did not frisk [K.H.-C.], but instead performed a full, personal search without probable cause to arrest, or any other exigency, was the firearm recovered from [K.H.-C. the] fruit of an unlawful warrantless search in violation of [K.H.-C.'s] rights under the Fourth and Fourteenth Amendments to the U.S. Constitution, and under the

_____

[5] Following the adjudication of delinquency on November 14, 2022, Judge Irvine relinquished jurisdiction to consolidate the case with two other open matters and the Honorable Joseph Fernandes entered a dispositional order the following day, on November 15, 2022.  Although counsel filed the notice of appeal from the order adjudicating K.H.-C. delinquent, the appeal properly lies from the dispositional order.  *See In re N.W.*, 6 A.3d 1020, 1021 n.1 (Pa. Super. 2010) ("In juvenile proceedings, a final order from which a direct appeal may be taken is the order of disposition, entered after the juvenile is adjudicated delinquent.  [However, o]ur rules provide that if [an] appeal is prematurely filed from an interlocutory order, the appeal is perfected when a final, appealable order is subsequently entered."); *see also* Pa.R.A.P. 905(a)(5) (notice of appeal filed after announcement of determination but before entry of appealable order shall be treated as filed after such entry and on day thereof).  We have amended the caption to reflect that the appeal is taken from the dispositional order.

broader protections of Article I, Section 8[,] of the Pennsylvania Constitution?

Appellant's Brief, at 4.

K.H.-C. asserts that there was "no justification [for Officer Anthony to] search or seiz[e him where t]he circumstances police relied on to justify their seizure of K.H.-C. were far from specific or individualized [and where] none of the criminal activity observed by the surveillance officers involved K.H.-C." *Id.* at 14.

> Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. When reviewing rulings of a suppression court, we must consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions draw therefrom are in error.

*In the Interest of D.M.*, 727 A.3d 556, 557 (Pa. 1999) (citations omitted).

"In determining whether reasonable suspicion exists for an investigative detention, or as it is also known in the common legal vernacular, a '*Terry*[6] stop,' the inquiry is the same under both the Fourth Amendment of the United States Constitution and the Article I, § 8 of the Pennsylvania Constitution." *Commonwealth v. Morrison*, 166 A.3d 357, 364 (Pa. Super. 2017). "The fundamental inquiry is an objective one, namely, whether the facts available

---

[6] *Terry v. Ohio*, 392 U.S. 1 (1968).

to the officer at the moment of the intrusion warrant a man of reasonable caution in the belief that the action taken was appropriate." *Id.*

In order to determine whether the police had a reasonable suspicion to subject an individual to an investigative detention, "the totality of the factual circumstances which existed at the time of the investigative detention must be considered." *Id.* *See Commonwealth v. Houck*, 102 A.3d 443, 456 (Pa. Super. 2014) (internal citations omitted) (In order "[t]o establish grounds for 'reasonable suspicion' . . . the officer must articulate specific observations which, in conjunction with reasonable inferences derived from these observations, led him to reasonably conclude, in light of his experience, that criminal activity was afoot and the person he stopped was involved in that activity.").

> Among the factors to be considered in establishing a basis for reasonable suspicion are tips, the reliability of the informants, time, location, and suspicious activity, including flight. Even where the circumstances surrounding an individual's conduct suggest ongoing illegality, the individual may not be detained unless his or her personal conduct substantiates involvement in that activity. This standard requires a particularized and objective basis for suspecting the particular person stopped of criminal activity.

*Morrison*, *supra* at 365.

In *Commonwealth v. Foglia*, 979 A.2d 357 (Pa. Super. 2009) (en banc), a police officer received an anonymous tip that a man, dressed in black, possessed a weapon at a given location. The officer observed two men, one of whom was wearing black and who began to engage in evasive behavior and touch his waist area. Knowing that guns are often concealed in waistbands,

- 7 -

the officer conducted a pat-down search of the defendant, during which he felt the handle of a gun in his waistband. The officer retrieved the weapon and, ultimately, the defendant admitted that he did not have a permit to carry the firearm. In affirming the trial court's denial of the defendant's suppression motion, our Court concluded that the officer

> was properly discharging his duties when he was investigating the veracity of an anonymous tip[,] was patrolling the area known for drugs and guns[, and,] upon viewing the police officer, [the defendant] engaged in evasive behavior [and] displayed hand movements consistent with custody of a weapon in his waistband, where such items are commonly hidden.

*Id.* at 361-62.

Instantly, the reliability of the information in the report relied upon by Officer Anthony was high, as it came from a narcotics surveillance police officer, as opposed to an anonymous tip. *Cf. Foglia*, *supra*; *Commonwealth v. Hawkins*, 692 A.2d 1068 (Pa. 1997) (where police officer, acting on anonymous information in radio broadcast that "man of particular description is carrying a gun," stopped and frisked man fitting physical description (black male wearing blue cap, black jeans and brownish coat), tip did not form independent basis for legal stop). Moreover, the fact that the surveillance officer relayed the information less than one minute before Officer Anthony stopped K.H.-C., further supports the veracity of the tip regarding time and location. Moreover, K.H.-C. was wearing clothing fitting the description of the suspects. *See Commonwealth v. Johnson*, 236 A.3d

1078 (Pa. Super. 2020).[7] *See also Commonwealth v. Thomas*, 179 A.3d 77 (Pa. Super. 2018) (reasonable suspicion existed for frisk, even where defendant did not meet exact description of suspect provided in radio call (black male with gun in high crime/violence area), when other factors existed to rouse suspicion). Finally, the surveillance officer who put out the flash information had reasonable suspicion to justify a stop based on the two hand-to-hand transactions he personally witnessed less than 40 minutes prior. *Commonwealth v. Queen*, 639 A.2d 443, 445 (Pa. 1994) ("[A] stop and frisk may be supported by a police radio bulletin *only* if evidence is offered at the suppression hearing establishing the articulable facts [that] support the reasonable suspicion.") (emphasis in original). *Cf. Commonwealth v. Shabezz*, 129 A.3d 529 (Pa. Super. 205) (order granting suppression affirmed where PARS report only stated defendant opened passenger door of car, leaned in, and had conversation with driver; arresting officer testified that he did not see any U.S. currency being exchanged, but only a "hand movement" between defendant and unidentified driver of car, and "contained no mention of pattern of narcotics activity at th[e] location" of stop).

While it is well-established that presence in a high-crime area, alone, cannot establish individualized suspicion, *see Commonwealth v. Illinois v. Wardlow*, 528 U.S. 119 (2000), *Commonwealth v. Jefferson*, 853 A.2d 404 (Pa. Super. 2004), here, the surveillance officers' detailed description in

---

[7] *See* Pa.R.A.P. 126(b)(2) (non-precedential decisions of Superior Court filed after May 1, 2019, may be cited for persuasive value).

the PARS report of the hand-to-hand transactions they witnessed over the course of less than one hour in the 900 block of North Carlisle Street, combined with the fact that the physical description of the suspects matched K.H.-C.'s clothing, provide the additional factors necessary to satisfy reasonable suspicion. *See* PARS Report, 10/7/22, at 2 ¶ 2 (officer observes unknown black male approach suspected sellers, engage in brief conversation, one seller and unknown male cross street to grey Dodge Durango, seller opens back door, reaches into car, and hands unknown male small item in exchange for unknown amount of U.S. currency); *id.* at 2 ¶ 4 (officer observes unknown black male approach one of suspected sellers who directs him to other suspected seller; males walk together, stop at grey Dodge, engage in brief conversation and suspected seller hands unknown male small items in exchange for unknown amount of U.S. currency). *Cf. Queen*, *supra* at 445-46 (suppression granted where suppression court "assumed" officer who relayed police radio bulletin possessed required facts to conduct investigatory stop but "did not have a description of the robbery suspect or the circumstances surrounding the robbery"). Therefore, based on the totality of the circumstances, we conclude that Officer Anthony "ha[d] a particularized and objective basis for suspecting [K.H.-C.] of criminal activity" and that he was not unlawfully seized. *Commonwealth v. Jackson*, 302 A.3d 737, 741 (Pa. 2023) (citation omitted).

With regard to the legality of Officer Anthony's search of K.H.-C. that uncovered the gun, we recognize that in order to ensure an officer's safety

during an investigative detention, "police may 'frisk' or pat down a person for weapons as recognized in **Terry**[, **supra**.]" **Interest of T.W.**, 261 A.3d 409, 416 (Pa. 2021). While a **Terry** frisk must be supported by "specific and articulable facts indicating the person [] intend[ed] to [be] frisk[ed] may be armed and dangerous[,]" **Commonwealth v. Cooper**, 994 A.3d 589, 593 (Pa. Super. 2010), the analysis is "guided by common sense concerns, giving preference to the safety of the officer during an encounter with a suspect where circumstances indicate that the suspect may have . . . a weapon.'" **Commonwealth v. Cunningham**, 287 A.3d 1, 11 (Pa. Super. 2022) (citation omitted). Finally, an officer conducting a stop "need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or the safety of others was in danger." **Commonwealth v. Cooper**, 994 A.2d 589, 592 (Pa. Super. 2010) (citation omitted).

Instantly, when Officer Anthony heard a metal sound when K.H.-C. banged against the car, he had a reasonable suspicion that K.H.-C. may have a weapon on his person. Moreover, in light of the fact that K.H.-C., himself, admitted he had a Glock with an extended clip in his waistband and that the officer was in an area known for increased violence and narcotics activity, he was more than justified in seizing the weapon for safety purposes. **See Foglia**, **supra** (Court acknowledging weapons commonly hidden in waistband). **Cf. Commonwealth v. Grahame**, 7 A.3d 810 (Pa. 2010) (officer lacked reasonable suspicion to conduct **Terry** search where she

conducted protective search of defendant's purse based on generalization that firearms commonly found in close proximity to illegal drugs and officer did not see defendant exhibit any unusual behavior or furtive movements or observe any suspicious bulge in defendant's purse).

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 2/12/2024